UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SOUTHERN OIL OF LOUISIANA LLC | * | CIVIL ACTION |
| VERSUS | * | NO. 21-2337 c/w 23-131 |
| ALLIANCE OFFSHORE, LLC, ET AL | * | MAG. JUDGE CURRAULT |

**DOCUMENT RELATES TO ALL CASES**

**PHASE I**
**(LIABILITY, INCLUDING LIMITATION AND ALLOCATION)**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

These consolidated cases arise from a vessel's allision with a fixed well platform in the Gulf of Mexico.  As described in detail below, in the early morning of December 2, 2021, the M/V MR. CADE (a vessel owned by Mr. Cade, LLC, managed by SeaTran Marine, LLC and on a bareboat charter to Alliance Offshore, L.L.C. (collectively, "Alliance") and being captained by Alliance's employee Capt. Christopher Tyndall), allided with a fixed well platform owned by Southern Oil of Louisiana, LLC ("Southern Oil").  Alliance contends that the allision was caused by Southern Oil's failure to comply with applicable U.S. Coast Guard regulations requiring that certain aids to navigation be affixed to well platforms (e.g., 360º lights and an operable foghorn).  Southern Oil alleges that the allision was caused by the negligence of Alliance and/or Capt. Tyndall (e.g., failure to properly use or operate radar and other onboard systems to detect the structure and excessive hours worked), unseaworthiness, and a defectively designed or manufactured lantern produced by Sabik Oy.  As a result of the allision, crew member Jeremy Turner allegedly sustained personal injuries, and both the vessel and well platform sustained damage.

1

Invoking FED. R. CIV. P. 9(h), Southern Oil filed suit against Alliance Offshore, LLC, SeaTran Marine, LLC, Iberia Crewboat & Marine Services, LLC,[1] Mr. Cade, LLC,  and the M/V MR CADE.[2] Civ. No. 21-2337, ECF No. 10 ¶¶ 1-10.  Alliance, SeaTran and Mr. Cade, LLC answered and filed a counterclaim alleging that Southern Oil's platform was not properly lighted and lacked a foghorn to alert vessels of its presence, which they allege caused the allision and consequent damage.  ECF No. 13 ¶¶ 8-10.  By Third Amended Complaint, Southern Oil asserted a Rule 14(c) contribution claim against Sabik Oy, alleging that Sabik Oy designed, manufactured, marketed, and sold a defective lantern that was a contributing cause of the allision.  ECF No. 50 ¶¶ 2, 7, 10-28.[3]  On January 10, 2023, Alliance and the M/V MR CADE filed a proceeding for exoneration or limitation.  Civ. No. 23-131, ECF No. 1.  Southern Oil and Jeremy Turner answered and filed claims in the limitation, and Turner filed an Amended Claim and Complaint.  ECF Nos. 6, 7 in No. 23-131 and ECF No. 83 in No. 21-2337.[4]  Southern Oil has stipulated it does not have and is no longer pursuing claims against Sabik for punitive damages or violation of the Louisiana Unfair Trade Practices Act, LA. REV. STAT. §§ 51:1401-1428.  ECF No. 148, Stip. #20, #21.

These consolidated matters were referred to the United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon the written consent of all parties.  ECF Nos. 39, 58.  The Court granted bifurcation and ordered that trial proceed in two phases:  (1) liability, including exoneration or limitation of liability and apportionment of fault, and (2) damages.  ECF Nos. 77, 127.

---

[1] Plaintiff voluntarily dismissed its claims against Iberia Crewboat & Marine Services, LLC.  ECF No. 11.

[2] Plaintiff voluntarily dismissed its claims against the M/V MR CADE.  ECF No. 26.

[3] By Second Amended Complaint, Southern Oil added Carmanah Technologies Corp. as a defendant, asserting that it purchased lanterns for its platform from Carmanah, but the lanterns were defective and inoperable on the night of the allision; it later voluntarily dismissed those claims without prejudice.  ECF No. 44 ¶¶ 10-28; No. 46.

[4] The Court granted Turner's motion to bifurcate and ordered that trial of the matter be bifurcated into two phases: (1) liability, including exoneration or limitation of liability and apportionment of fault, and (2) damages.  ECF No. 77.

The Court heard the first phase of the case, without a jury, on July 22-23, 2024.  At the beginning of the trial, the parties introduced Joint Exhibits 1-46, 48-50, 52-82 ("Exhibits") along with a corrected Exhibit 13.  During trial, the parties introduced additional Exhibits J 15a, J 2a, J 39a, J 52-16a, and J 52-16b.  Southern Oil also introduced exhibits SO 1, SO 3-9, and Alliance introduced exhibits A 17 and A 18.  ECF Nos. 162, 163.  The Court admitted all of the listed exhibits and heard testimony from the following witnesses:

| | | |
|---|---|---|
| Harvey Kelley | Andrew Minster (expert) | George Mahl (expert–via depo) |
| Jason Lacoste | Jared Chiasson | Andrea Stewart (via depo) |
| Thomas Dale Carter | Capt. Christopher Tyndall | Christopher Karentz (expert–via depo) |
| Todd Fuselier | Ronald May (expert) | |
| Bryan Miller | Mark Lane (expert–via depo) | Brandon Magie (via depo) |
| Shane Schexnider | David Scruton(expert-via depo) | Jeremy Turner (via depo) |

ECF No. 163.  Alliance moved for directed verdict at the close of Southern Oil's case as to the claims of manufacturing defect, design defect, redhibitory defect, failure to warn, and breach of express warranty claims.  In light of the deposition submissions, the Court deferred ruling until completing review of the deposition testimony introduced during trial.

Having considered the evidence adduced at trial, the record, the testimony of the witnesses, the arguments and written submissions of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).  To the extent, if any, that any of the following findings of fact constitute conclusions of law, or vice versa, they are adopted as such.

## **FINDINGS OF FACT**

### I.    **Background**

1.    Plaintiff/Claimant Southern Oil is the owner/operator of the Corvus Well and Platform located in the Gulf of Mexico in Breton Sound Block 51 ("BS 51"), which has been in place and producing hydrocarbons for seventeen years.  ECF No. 148, Stip. #1, #2.

2.     The MP45 Corvus/SL 18550#1 Well and Platform (the "Well") consists of a metal caisson, a two-level metal platform, a boat dock, and an access ladder that extends twenty to thirty feet above water level.  The Well contained two light fixtures on opposing corners of the structure.

3.     The BS 51 platform is a manned platform that usually has 3 or 4 workers (a foreman and 2-3 operators) stationed there at a time.  From the BS 51, these workers oversee 20-25 other structures (or if counting multi-structure platforms as a single structure, about 12 other structures), including the Well at issue.  Kelley Test.; Carter Test.

4.     Thomas Dale Carter and Ashley Stegall (now deceased) were the foremen for Southern Oil assigned to the BS 51 at the time of the incident, each working 2 weeks on, 2 weeks off.  Carter has been in the industry over 25 years.  Carter Test.

5.     Defendant/Petitioner M/V MR CADE is a crew boat owned by Mr. Cade, LLC and operated by Alliance Offshore, LLC pursuant to a bareboat charter arrangement.  ECF No. 148, Stip. #3.  At the time of and before the allision, the vessel was being operated by Capt. Chris Tyndall.  ECF No. 148, Stip. #13.

6.     Alliance's HR Manager Jared Chiasson hired Capt. Tyndall on July 29, 2021, and assigned him to the M/V MR. CADE.  He has hired over 100 captains and determined that Capt. Tyndall was competent by interviewing him and looking at his years of experience, valid credentials, references, and work history.  When a captain applies for a job and has a valid license, Chiasson assumes they have prior radar training and know how radar functions.  Chiasson Test.

7.     Capt. Tyndall has been a pilot for about ten years.  He had a 100-ton license when hired by Alliance but later obtained a 200-ton license in October 2021.  Tyndall Test.  He did not have a radar endorsement on December 2, 2021 (ECF No. 148, Stip. #14), but he took the class and obtained an unlimited radar endorsement a few months later.  Tyndall Test.

8.      The M/V MR. CADE had two separate radar systems, Rose Point Coastal Explorer, GP-39 GPS Navigator, Furuno FA170 Automatic Identification System ("AIS"), Furuno Navpilot auto pilot system, and paper charts.  Rose Point displays charts of the Gulf and enables the captain to plot a voyage plan and overlay it over the charted obstacles.  Tyndall Test.  *See also* J-67 – J-71; J-78; SO-9.

9.      Tyndall had no school training on how to operate radar, GPS, AIS or Rose Point at the time of the allision.  All of the manuals for these pieces of equipment were on the vessel, but Capt. Tyndall did not review them because he had prior experience with those programs through his approximately 7 years of work as a captain prior to the allision.  Tyndall Test.

10.     The Well was included on both navigational charts and the M/V MR CADE's Rose Point Explorer/electronic navigational aid/chart plotter.  ECF No. 148, Stip. #4.

11.     Tyndall was not aware that he could overlay radar over the digital chart. Tyndall Test.

12.     Capt. Tyndall had tuned one radar device to ½ mile range and the other radar device to ¾ mile range.  Tyndall Test.

13.     The radar systems have alarm features, but Capt. Tyndall did not know how to set those alarms.  Karentz, 37:4-12.  Capt. Tyndall had turned the alarms off because the proximity to structures would have constantly set off the alarms.  Tyndall Test.

14.     If the radar failed to pick up the object, the alarm features would not have sounded either.  Karentz, 37:13-25.

15.     On December 1-2, 2021, the M/V MR CADE was operating in the Gulf of Mexico offshore Louisiana in the area of the platform and well in Main Pass Block 45.  ECF No. 148, Stip. #11.  At approximately 12:30 a.m. on December 2, the M/V MR. CADE allided with the Well.  The SCADA (satellite communication) from the Well went down approximately 12:28 a.m. on December 2, 2021.  Kelley Test.

16.     Jeremy Turner, an employee of Alliance Offshore on December 2, 2021, was in the vessel's rudder room at the time of the allision.  ECF No. 148, Stip. #23, #24.  At the time of the allision, he was in the course and scope of his employment with Alliance Offshore and did not cause or contribute to the allision.  ECF No. 148, Stip. #25, #26.

17.     Weather was not a factor in the December 2, 2021 allision.  ECF No. 148, Stip. #22.  The night was clear, seas were calm, no rain or fog; it was very dark with no moonlight.  Stewart, 70:17-71:9.

18.     Capt. Tyndall had woken up at approximately 10:30 am on December 1, 2021.  After getting some coffee and doing his normal morning pre-shift things, such as inspecting the vessel, he began his watch at 12 noon.  He was still on watch at the time of the allision at approximately 12:30 a.m. on December 2, 2021.  Tyndall Test.  Thus, Capt. Tyndall was approximately 30 minutes past the 12-hour maximum work period at the time of the allision.

19.     Of Capt. Tyndall's 12 hour watch, 6 hours was standby time.  Karentz, 20:13-21:16.  Although Capt. Tyndall had approximately 6 hours of standby time during his watch, he remained on watch that entire twelve hour period and thus had no "rest period" during that shift.  Scruton, 19:11-19, 37:3-11; *see also* Karentz, 21:7-27:6.

20.     Alliance has training and a policy on rest/fatigue which is addressed during orientation and part of its 52-week annual training.  Chiasson Test.

21.     Capt. Tyndall did not feel fatigued or tired at the time of the allision as several hours of his watch time was spent on standby.  Tyndall Test.  He did, however, go to the galley to get coffee shortly before the allision.

22.     Mr. Chiasson, along with Alliance coordinators, handled scheduling of captains for their hitches.  He tries to consider a worker's travel scheduled in shift scheduling.  But the captains handle watch schedules on the vessel.  Chiasson Test.

23.     At approximately 10:00 pm, Capt. Brandon Magie boarded the M/V MR. CADE after having driven approximately 9-10 hours from his home in Texas.  Tyndall Test.  Capt. Tyndall suggested Capt. Magie get some rest before taking over watch.  Tyndall Test.

24.     Before the allision, Capt. Tyndall had departed the EPS dock at Venice at approximately 11:00 pm.  As he exited Baptiste Collette, he saw a shrimp trawler, so he reduced speed and changed the charted course from his original voyage plan by making a wide port turn to not wake the trawler's vessel.  Tyndall Test.

25.     Capt. Tyndall was very familiar with the Main Pass areas, having worked in the same area while with other employers as well.  Based on his prior experience, Capt. Tyndall was  aware that the Main Pass area is somewhat dangerous to operate in because there are several structures nearby.  Tyndall Test.

26.     Although Capt. Tyndall testified that he began "veering towards the original voyage plan," after passing the trawler,  the record reflects that he maintained a course parallel to the charted course for roughly six nautical miles before alliding with the Well.  *See* Ex. J-52-16B.  Capt. Tyndall further testified that at least 10-15 minutes passed between the time he deviated from the voyage plan to the time the vessel struck the Well.

27.     Deckhand Andrea Stewart came to the wheelhouse at approximately 11:30 or 11:45 p.m.  Stewart, 33:16-22.  While still on the deviation from the voyage plan, Capt. Tyndall engaged the autopilot and left Stewart to monitor the vessel while Capt. Tyndall went down to get a cup of coffee.  Capt. Tyndall spent approximately one minute in the galley, and he felt it was safe to leave Stewart because he had steering ability.  Tyndall Test.; J-5, Ex. 7.

28.     After Capt. Tyndall returned to the wheelhouse from getting coffee, he steered the vessel back toward his original voyage plan and increased his speed.  Tyndall Test.

29.     Capt. Tyndall did not consult his Rose Point Explorer, either when he deviated from his charted voyage plan or when he sought to return to the charted voyage plan, to assess potential obstructions.

30.     After getting coffee and returning the vessel to its original voyage plan, Capt. Tyndall stood looking out of the window in front of him.  He saw a dark area directly ahead and, after checking his radar and not seeing anything, he turned on his spotlight, which illuminated the Well approximately 30 yards directly ahead of him.  Unable to avoid the Well, he decreased speed but did not reverse engines because he knew he could not avoid the structure and wanted to keep the bow low to avoid impact above the vessel's waterline to reduce the risk of sinking were the vessel to sustain damage below the water line.  Tyndall Test.  Capt. Tyndall was back in the wheelhouse for about 5-15 minutes before the allision.  Stewart, 58:4-16; Tyndall Test.

31.     Platforms such as the Well usually show up on radar, and Capt. Tyndall, as well as others, regularly saw this Well on radar with the exception of this one incident.  Karentz, 38:24-39:23.  Tyndall does not recall any prior occasion where this Well did not show up on radar.  Tyndall Test.

32.     On the day of the allision, the Well did not show up on either one of the two separate radars systems onboard the M/V MR. CADE.  Tyndall Test.

33.     After the allision, Capt. Tyndall sounded the general alarm and Capt. Magie came to the wheelhouse.  They all looked at the radar and tried to pick up the structure but could not.  Tyndall Test; Magie Test. 9:16-21, 49:25-50:3.

34.      One radar system was significantly damaged in the allision, but the other radar system remained operable.  *See* Ex. J-77-3.  No one provided any evidence of any damage to the remaining operable radar system, either before or after the allision.  Capt. Karentz opined that the Well may not have shown up on radar or other systems for various reasons.  For instance, when an object is head-on, directly in the vessel's path, the image may reflect back twice and not show up properly when the

8

radar received the image or electronic information, or the radar emission could bounce back off the mass and blank out anything directly ahead of the boat. Similarly, it may be hidden under the heading flasher. Karentz, 40:10-41:5. Vessels often change course a few degrees to allow radar to capture objects in the direct path. *Id.*

35.     After the allision, Capt. Tyndall steered the vessel on a 360º pass around the Well, during which cellphone video recorded the scene. Tyndall Test.; Ex. J-76-1. The video shows the southern light blinking, but the northern light inoperable.

36.     After returning to the dock following the allision, Capt. Tyndall told Southern Oil's Harvey Kelley that the Well did not show up on radar, and the Well had no light or foghorn. Kelley Test.

### A.     The Nav Aids

37.     On July 19, 2012, the U.S. Coast Guard approved the M650H lanterns for use as private aids to navigation on Class C structures, like the Well. ECF No. 148, Stip. #15; Ex. J-9. The M650H has a range up to 4 nautical miles. Ex. J-10 at 1-2.

38.     Sabik Oy designed, manufactured, marketed, and sold a Carmanah-branded LED Solar Marine Lantern designated as Model 650H, which was designed for use as navigational aids for buoys, docks, platforms, and beacons. ECF No. 148, Stip. #5. This lantern was marketed as a cost-effective, high-performance, low maintenance, and easy-to-install solar LED marine lantern ideal for use as aids-to-navigation and having a long-lasting battery, extreme temperature range, and five-year life expectancy with a simple installation that consisted of attaching the self-contained light unit to the structure using three M6 bolts. ECF No. 148, Stip. #6, #7.

39.     The M650H uses a sealed lead acid AGM battery, which is one of the best available. Lane, 40:23-42:9.

40.     Jason Lacoste is the Aids to Navigation Service Manager for Essi Corporation ("Essi").  Lacoste Test.  Essi purchased several M650H lanterns, including those bearing serial numbers 1560059508 and 1560059732, on July 25, 2019.  Essi sold electrician Bryan Miller (via United Control Systems) two M650H lanterns along with the IR (infrared) remote on May 31, 2019, and then sold him two more M650H lanterns on November 18, 2019.  ECF No. 148, Stip. #16; Ex. J-10 at 3-4, 6-7.  The IR remote cost $28.  Ex. J-10 at 4.

41.     When Essi sells the M650H lanterns, it provides the lantern in a box with a brochure and one bird deterrent.  Lacoste Test.  The upper left corner of the backside of the brochure shows the internal display screen that provides relevant lantern information.  Specifically, the display provides information regarding, among other things, battery health, voltage, intensity, and flash code. Information about the battery health is also available via the IR (infrared remote) or through a USB port that hooks up to a computer.  Lacoste Test.

42.     The M650H has a User Manual.  Ex. J-39.  Essi has copies of the M650H User Manual available, but most buyers access the User Manual via the internet, downloading the pdf of same to their phones so that the User Manual may be accessed from any location.  Lacoste Test.  The User Manual stresses the importance of battery health to the proper functioning of the lantern.  Lane Test., 98:19-100:17.  When the battery is depleted or not working properly, the output will be dim.  Lane Test., 106:5-15; 138:15-139:1; 175:21-177:14.

43.     Essi presets the M650H lanterns to Coast Guard specifications, but the customer can refer to the User Manual to change those settings.  When Essi programs the M650H to comply with Coast Guard regulations, it turns off the automatic light control feature.  With that feature turned off, when the battery depletes, the light will stop working rather than get dimmer or flash at a lower intensity.  Lacoste Test.

44.    At the time the lantern at issue left the factory, it was in working order and continued to work properly for approximately a year, while affixed to the Pegasus and prior to removal from that well.  Mahl, 27:24-28:3; 71:14-24.

45.    The light should be inspected at least annually, but most users perform quarterly inspections.  Regular maintenance consists of checking the battery health and making sure the lanterns are clean.  Lacoste Test.  The M650H has several available avenues to check battery health:  (1) the LED screen display on the underside of the lantern; (2) with the IR remote; or (3) testing the battery with a voltmeter. Lacoste Test.; May Test.  The user should check the battery health via one of these methods, not simply by covering the lantern to see if it flashes.  Lacoste Test.

46.    Foreman Carter decided to change the lanterns on the Well because they were having problems with the earlier lights, and Stegall decided to transition to the M650H lantern because it was self-contained and required little maintenance.  Carter Test.

47.    Bryan Miller has owned United Control Services for 22 years and has worked in the electrical field for 42 years.  He installed the navigational lighting aboard the Well on March 8, 2021 by installing two M650H lanterns, one on the northwest side and the other on the southeast side of the platform.  ECF No. 148, Stips. #8 - #10; Miller Test.

48.    Miller has used Carmanah lights for 5-6 years.  He worked with Southern Oil operators when they decided to go with the Carmanah lanterns because they cost less, were self-contained, and did not require a solar bank.  Most of the information he got was from Essi, and he was told these lights were reliable and low maintenance.  Miller Test.

49.    Shane Schexnider has worked on BS 51 for 8 years, first as operator and later lead operator.  Schexnider Test.  Schexnider was not on the platform on December 2, 2021.  He was, however, on the platform and assisted Bryan Miller with changing the lights on March 8, 2021.  *Id*.

50.     Southern Oil has no documents tracing the custody or location of the lantern at issue between its acquisition in September 2019 and installation on the Well on March 8, 2021, nor does it have any documents reflecting the care or maintenance of the lantern after installation on March 8, 2021 through the December 2, 2021 allision.  ECF No. 148, Stip. #17, #18.

51.     Mr. Kelley and Mr. Carter were not aware that the lantern had previously been used on another platform or that it was not functioning properly when installed.  Rather, they thought the lights were new.  Kelley Test.; Carter Test.  There is no dispute, however, that the lights installed on the Well on March 8, 2021, were not new or "just out of the box."  Rather, they had been used on another platform (the Pegasus) and removed when work was being done on that platform.

52.     No one could identify who removed the lights from the Pegasus.  After removal, the lights were kept on the BS 51 platform, either behind the line heater or on top of the tool shed, for approximately five months before being installed at the Well on March 8, 2021.  Schexnider Test.

53.     Miller could not recall whether he replaced both lights or only one light on March 8, 2021.  Ex. J-33; Kelley Test.  He did not fill in the volt information on that form because he thought that information was not available because it was a self-contained unit, and he did not know how to open the lantern to test the battery.  Instead, he simply tested the unit by covering it with a box to ensure it blinked.  Miller Test.; Ex. J-33-1.

54.     Southern Oil engages a third party to come out quarterly to perform inspections of the structures.  Kelley Test.  Electrician Miller did his best to conduct Southern Oil's quarterly inspections though he did not inspect quarterly during the COVID pandemic.  After each inspection, he would fill out paperwork and take one copy for his files and leave one copy with BS 51.  Given that Miller's last report is dated March 8, 2021, Miller conceded that he may not have gone back out to test the lantern after installation on March 8, 2021 and before the December 2, 2021 incident.  Miller Test.;

*see also* Exs. 37, 38, 53-65.  There were no quarterly inspections of the lantern by Miller or any other electrician after the March 8, 2021 installation.

55.     The Southern Oil workers would visit the BS 51 area structures (including the Well) whenever a boat was available, usually at least once or twice a week, to do rounds.  Schexnider Test.; Fuselier Test.  During rounds, the workers would check for leaks, verify sensors, check nav aids (such as lights), and clean solar panels.

56.     Miller did not provide any instructions on how the workers could perform light checks. Schexnider Test.  The operators would conduct lights checks by covering the fixture and checking for a flash; the operators did not perform voltage checks or battery health checks.  Schexnider Test. For units that do not have self-contained batteries, operators check volt and bulbs.  Fuselier Test.  For the M60H lanterns, they did not know how to check the battery status via the display on the bottom of the unit.  Fuselier Test.

57.     In addition to the routine platform checks, after sunset and from the BS 51, an operator would scan the area nightly (weather permitting) through a spotting scope to confirm that the lights were blinking on the structures.  Kelley Test.; Schexnider Test.; Carter Test.  They did not have a schedule to check the lights throughout the night and just assumed the light continued to work.  Carter Test.

58.     Although electrician Bryan Miller and crew member Shane Schexnider testified they also checked the lights using the spotting scope when they woke up before sunrise, that testimony occurred only after other witnesses testified that they used the spotting scope at sunset and admittedly did not take any steps to determine whether the light remained operable all night.  The suggestion that these two later witnesses also conducted early morning spotting scope checks is not credible.  Further, Miller did not recall whether he checked any lights using the spotting scope in March 2021, which was the last time he was on the BS 51.  Miller Test.

59.     There is no checklist implementing any operations manual or policies and procedures relating to the crew's regular platform checks. Fuselier Test. Likewise, there is no written procedure to perform nightly checks of lighting or documentation when same is completed. Carter Test.

60.     The Well lies approximately 4-6 miles from the BS 51 manned platform. From that distance and vantage point, you can only see that a light was blinking, not whether it was the northern or southern lantern. You cannot see that both lights are blinking at the same time. Carter Test.; Schexnider Test.; J-76-1.

61.     Any documentation of such nightly spotting scope inspections would be in the daily log, which should reflect people on board and when and how often the workers had access to a vessel for platform checks. Kelley Test.; Carter Test. The BS 51 daily log was not produced during discovery or introduced at trial. Likewise, Southern Oil did not introduce any documentary evidence reflecting that any Southern Oil worker or third party inspector inspected the lights on the Well after the March 8, 2021 installation. Kelley Test.

62.     When electrician Bryan Miller installed the lanterns on March 8, 2021, he did not review the User Manual at that time. He recalls reviewing the User Manual when the lights first came out. Miller Test. (Carmanah first obtained Coast Guard approval for the M650H lantern in 2012. Ex. J-9; Lane Depo. 17:15-18).

63.     The lantern has several alternative means to test the battery's health: (1) open the bottom to read the display screen to check the battery health; (2) use the IR remote to force the light to flash a code indicating its battery health; (3) remove the battery to test with a voltmeter (which Miller had with him at installation because he checked the voltage of the foghorn (Ex. 33)). Simply checking to see if the light flashes is insufficient to determine the battery health. If the light comes on at dusk, that does not mean it is fully operational because, depending on the amount of sun, it may

have put in just enough energy to charge the battery to operate the lantern for a short period of time rather than the entire night. Lane, 118:12-120:3.

64.     Although Miller purchased an IR remote in May 2019 (which he believes went missing from the BS 51) and had his voltmeter when installing the lantern on March 8, 2021 (Ex. J-33 at 1)), before installing, he simply determined that the light flashed by covering it, without taking any steps to determine the health of the battery through any one of the several methods available to do so. Miller Test.  Although a Southern Oil employee (Carter) testified that Miller checked the lantern using the IR remote, Miller testified that he never used an IR remote to check the battery's health for any platform and does not recall whether he knew that the IR remote could check the voltage or battery health.  Miller did not test the light beyond covering it with a box to ensure it blinked.  Miller Test.  Operators could take the IR remote with them to check the lights during the weekly routine visits, but Carter did not know how to use the IR remote and didn't think other operators knew either or thought they could not get it to work right.  Carter Test.

65.     Once installed, you cannot access the onsite display to check the battery health without unbolting the three bolts holding the lantern to the Well.  Before installation (and before the allision), Miller did not know that you could look at the display on the bottom of the lantern to check on the battery health.  Likewise, he did not know that you could unscrew the bottom to check the battery with a voltmeter.  Miller Test.

66.     Miller's trial testimony reflected that he lacked a basic understanding or familiarity with the M650H and essentially had no understanding of the numerous avenues to test the battery health of the lantern.  In fact, he testified that if it stopped working, he would just replace the entire lantern, not replace the battery.  Miller Test.  Had Miller read the M650H User Manual or discussed the attributes of this fixture with his Essi representative, he would have learned how to determine the

health of the battery.  The bad battery could have been replaced before installing the lantern on March 8, 2021.  Mahl Depo., 79:10-13.

67.     The lantern came with a single bird deterrent but had slots for up to three bird deterrents.  The bird deterrent affixed to the lantern appeared to be out of place though no witness testified as to its condition at the time of the allision.  Witnesses did, however, indicate that they would move the deterrent to cover the lantern with a box or bag to check whether it flashed during routine platform checks.  Schexnider Test.

68.     Southern Oil could have added more bird deterrents but, as Mr. Carter explained, none of them really work.  Carter Test.

69.     The lantern's maintenance schedule is best determined by the end user who knows the conditions to which it is exposed.  Lane Depo., 209:11-210:9.  If one bird deterrent and weekly cleaning was insufficient to ensure bird droppings did not interfere with operation or potentially damage the lantern, more frequent cleaning should have been done.

70.     Miller had no issues with any other M650H lanterns on other platforms.  Miller Test.  The lantern at issue worked properly for almost a year.  Around the time that it was removed from the Pegasus and stored on BS 51, its data log shows an issue impacting either its motherboard or battery.  Ex. J-44, May Test.  That defect did not exist at the time of manufacture or sale, but rather, developed almost a year later after its use on, and removal from, the Pegasus.

71.     The lantern's battery was not in good working condition when the lantern was installed on the Well on March 8, 2021.  An inspection of the battery health would have revealed problems necessitating further inspection to determine whether the problem was with the lantern, its battery or some other component.

72.     The battery condition resulted in the lantern obtaining insufficient daily charge to allow the light to remain operable throughout the entire night.  Although the battery would accept

some charge to power the light to blink were someone to merely cover the light for a few minutes to check it, the battery would not charge sufficiently to power the lantern to remain illuminated throughout the course of the night.

73.     In the early morning of December 2, 2021, the battery had depleted, and the light was not illuminated or blinking.  Consequently, the Well was not visible to the naked eye from the vessel's wheelhouse before Capt. Tyndall turned on the spotlight because the Well's northern lantern was completely dark.  Ex. J-5 (video labelled 1-Bow, Platform Collision); Stewart Depo., 86:7-87:19.  At that time, only the southern lantern was operating.  Ex. J-76-1 (360º post-allision video).

74.     No one on the vessel heard the foghorn sound before the allision.  Tyndall Test.; Stewart, 85:15-86:6.  However, at the M/V MR. CADE's speed with the windows closed, those inside most likely would not have heard the foghorn.  Tyndall Test.; Karentz Depo., 16:1-21.

75.     The first person to arrive at the Well after the allision was operator Fuselier with two Coast Guard employees who arrived around 9:00-10:00 am.  Fuselier found the foghorn hanging by its cord, so he was not able to test it.  It looked like the foghorn had fallen off the box during allision.  Fuselier Test.

76.     When Fuselier arrived at the Well at around 9:00-10:00 a.m. following the allision, he placed a box over both lights and they flashed.  Fuselier Test.

77.     Later that day, Kelley went to the Well and found the foghorn laying on the ground.  He does not know when it became inoperable but also believes it fell off during allision.  When he picked it up and plugged it in, the horn worked.  Kelley also covered each lantern with a black bag or his jacket and saw the lights blinking.  The northern light was about 50% dimmer and blinked less frequently than the southern light.  Kelley Test.

78.     The Court finds that the foghorn fell off during the allision.

B.      **Post-Allision Inspection of the Nav Lights**

79.      Electrical Engineering experts George Mahl and Ronald May traveled to the Well to remove both the northern and southern lanterns on June 6, 2022, before Southern Oil named Sabik Oy a party to this lawsuit.  ECF No. 148, Stip. #19.  Neither had any prior experience with the M650H lantern.  May Test.; Mahl Depo. At 9:2-5.

80.      When initially inspecting the lanterns, neither Mahl nor May had a copy of the M650H User Manual nor did they understand the codes on the lantern's built-in display.  Mahl, 18:7-20:8; 51:18-55:9; 85:22-87:8.

81.      In October 2023, experts Mahl and May went to Nashville to inspect the lanterns at Sabik Oy's SPX/Carmanah facility.  Mahl Depo, at 20:9-11.  In Nashville, the Sabik/SPX/Carmanah employee connected the lantern to their computer system and downloaded its information to produce a G-log, which is essentially the lantern's "black box" providing a record of operations including time switched on and off, voltage, temperature, and other pertinent information.  Ex. J-44; Mahl Depo., 21:6-11; 28:14-30:18; Lane Depo., 160:23-168:14; May Test.

82.      The G-log reflects that something happened on or about September 2, 2020, that impacted the battery charging circuit, after which the lantern's battery indicated it was bad.  Ex. 44 at 20; Mahl Depo., 66:17-68:10; Lane Depo., 175:14-180:15.  An event like a nearby lighting strike could cause such damage.  Lane Depo., 213:14-214:20.

83.      Mahl opined that the use of a single bird deterrent was inadequate to address the large amount of bird droppings.  The lantern's design, however, accommodated up to three bird deterrents. If excessive droppings were experienced and the user elected not to purchase additional bird deterrents, the user could also have addressed excessive bird droppings by more frequent cleaning (i.e., more than the once a week or every other week as indicated by Southern Oil employees).

84.      The M650H lantern was not defectively designed with regard to bird deterrents.

85.     Although Mahl had initially opined that the battery was charged at a high voltage that damaged the battery, after the deposition of Mark Lane, Mahl changed his opinion to suggest that there was an internal fault in the lantern, which developed over a year after the lantern left the factory, that either caused the high voltage on the battery resulting in damage or caused an erroneous reading that resulted in the battery not charging.  Mahl Depo., 37:8-38:3; 71:14-24.  Mahl suggested that the defect was either a design defect or manufacturing defect and, because other lanterns functioned properly, he concluded it was some unidentified manufacturing defect.  Mahl Depo. 40:19-41:13. Mahl did not consider any misuse, abuse or damage, and he had no information about how the lantern was used or maintained during the lengthy period after it left the factory. Mahl Depo., 41:8-42:12; 64:7-66:16.

86.     Mahl did not identify any alleged manufacturing defect and stated that he did not know what the manufacturing defect was or even that the battery was defectively designed or manufactured. Mahl Depo., 42:15-16; 61:10-17.  Rather, he suggests that there are more resilient batteries that could have been employed but then indicated that there was probably not another battery available that would have made any difference.  Mahl Depo., 61:24-63:25.

87.     The battery in the northern lantern reflected battery failure as early as September 2020, long before installation on the Well on March 8, 2021.  Ex. J-44.  The battery was not properly recharging to a full charge, resulting in the battery running out of power to operate the light throughout the entire night through sunrise.

88.     The September 2, 2020, event that damaged the battery circuit could also have compromised the lantern's ability to continue recording the log whereby the processor was still handling the photocell allowing the light to function intermittently but not recording log entries.  Lane Depo., 195:11-197:16.

89.     Both the vessel and Well sustained damages in the allision.  ECF No. 148, Stip. #12.

90.     The market value of M/V MR. CADE as of December 2021 was $1.5 million. Although the market value was $4.5 million in 2018, with COVID-19, the substantial slowdown of operations in the Gulf, and lack of vessel demand, the value decreased substantially because vessels were just sitting in storage.  Minster Test.  *See also* Ex. A-17.

**CONCLUSIONS OF LAW**

### I.     Jurisdiction

1.     This Court has jurisdiction over the claims in the complaint under the admiralty and maritime laws of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure.  Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b) because a significant portion of the events occurred within this district.  All parties consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### II.    Claims at Issue

2.     Southern Oil asserts general maritime negligence and unseaworthiness claims against Alliance Offshore, L.L.C., Seatran Marine, LLC, and Mr. Cade, LLC, *in personam*, (collectively, "Alliance").   ECF No. 148 at 5-9, 35 ¶¶ 9(3)-(5).

3.     Southern Oil asserts maritime products liability, Rule 14(c) maritime contribution, redhibition, negligent misrepresentation, breach of express warranty, and negligence claims against Sabik Oy, manufacturer of the subject lantern.  *Id*. at 5-9, 35-36 ¶¶ 9 (9)-(14).

4.     Alliance asserts a general maritime negligence counterclaim against Southern Oil for damages allegedly caused by Southern Oil's failure to properly light and affix a functional foghorn to the Corvus Well.  *Id*. at 15-17.  Alliance further seeks to limit its liability under 46 U.S.C. § 30501, arguing that the cause of the allision was not within the vessel owner's privity or knowledge or within the knowledge of the vessel master or managing agent at or before the beginning of the voyage.  *Id*. at 36 ¶ 9(20).  Jeremy Turner asserts Jones Act personal injury and unseaworthiness claims against

20

Alliance for injuries allegedly sustained as a result of the allision, general maritime negligence claims against Southern Oil, and a maritime products liability claim against Sabik Oy. *Id.* at 17-24.[5]

5.      In response to Alliance's counterclaim asserting maritime negligence, Southern Oil invoked Rule 14(c) to both tender Sabik Oy to Alliance and assert a contribution claim against Sabik. *See* ECF Nos. 44, Count II, at 7; 50. *See Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 242-43 (5th Cir. 2009) (under Rule 14(c), a party defending an admiralty or maritime claim may "implead a third-party for two purposes: (1) to seek contribution or indemnification from the third-party defendant, and (2) to tender the third-party defendant to the plaintiff.") (citation omitted).

**III.    Fault of the Parties**

6.      In admiralty cases, the standard of care is established by statutes or regulations, maritime custom, or by the general principles of negligence law. *S.C. Loveland, Inc. v. E.W. Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1979); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5–2 (2d ed. 1994).

7.      Rule 7 of the Inland Rules of Navigation states that "Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects." 33 C.F.R. § 83.07. Rule 5 provides: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05.

8.      "General principles of negligence guide the analysis of a maritime tort case." *Casaceli v. Martech International, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985). "To state a claim for relief under maritime law, the 'plaintiff must demonstrate that there was a duty owed by the defendant to the

---

[5] Turner further alleges that Alliance is guilty of willful and wanton misconduct in failing to provide him with maintenance and cure ( *Id.* ¶ XIII, at 10), but the parties agreed to defer maintenance and cure and medical causation until the second phase of trial.

plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (internal quotation omitted)).

9.      "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *Id.* (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)).  "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the [allision].'" *American River Transportation Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (quoting *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)).

10.      "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime [allision], liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible to fairly measure the comparative degree of their fault." *United States v. Reliable Transfer*, 421 U.S. 397, 411 (1975).  Thus, a primary question before the Court is who at fault for the allision, and if more than one party is at fault, the degree of fault shared for the allision.

11.      "Under general maritime law, joint tortfeasors are held jointly and severally liable to a plaintiff," but a joint tortfeasor's liability is determined through comparative fault.  *Matter of Jack'd Up Charters LLC,* 690 F. Supp. 3d 560, 570 (E.D. La. 2023) (Brown, C.J.) (citing *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220, (1994); *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975)). "To reconcile comparative fault with joint and several liability, maritime law recognizes the right of contribution between joint tortfeasors."  *Id*. (citing SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5:16).  A defendant that pays more than its pro rata share of a judgment may invoke

the right of contribution to collect from other parties their allocated portions of the judgment based on comparative fault. *Id*. In other words, "[a] contribution cause of action arises . . . when a tortfeasor actually pays more than its share of the judgment." *Id*. "[C]ases from the federal district courts of Louisiana suggest that a defendant can assert contribution claims against a third-party defendant." *Id*. (citing cases).

12.    Rule 14(c) " also requires the third-party plaintiff (1) to assert an action sounding [in] admiralty or maritime, (2) that arises out of the same transaction, occurrence, or series of transactions or occurrences as the plaintiff's original claim, and (3) over which the district court has jurisdiction." *Supreme Rice, L.L.C. v. Turn Services, L.L.C.,* 475 F. Supp. 3d 556, 560 (E.D. La. 2020) (citation and internal quotations omitted).

13.    As the Supreme Court stated in *Exxon Co., U.S.A. v. Sofec, Inc.,* "The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." 517 U.S. 830, 837 (citing 1 T. Schoenbaum, Admiralty and Maritime Law § 165-166 (2d ed. 1994)). "Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation." *Id*. (citing 1 T. Schoenbaum, Admiralty and Maritime Law § 165-166 (2d ed. 1994)).

14.    A third-person's act is not a superseding cause if "(a) the actor at the time of the negligent conduct should have realized that a third person might so act; (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily

23

negligent." *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 652 (5th Cir. 1992) (citing *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464-65 (5th Cir. 1984)).

15.     The parties invoke two maritime presumptions: *The Oregon Rule*, and *The Pennsylvania* Rule to address liability.  *The Oregon* Rule "provides that a moving vessel that allides with a stationary object is deemed to be presumptively at fault for the negligence."  *N.D. Shipping, S.A. v. ZAGORA M/V,* No. 06-10734, 2009 WL 1606877, at *5 (E.D. La. June 5, 2009) (citing *The Oregon*, 158 U.S. 186, 197 (1895)).  *The Oregon* Rule's "presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way."  *American Petrofina Pipeline Co., v. M/V Shoko Maru*, 837 F. 2d. 1324 (5th Cir. 1988) (citing *Delta Transload*, 818 F.2d at 449; *Bunge*, 558 F.2d at 795).  "*The Oregon* presumption 'only applies in the absence of evidence of fault.'"  *Impala Terminals Burnside LLC v. Marquette Transportation Co., LLC,* No. 19-12584, 2021 WL 1123566, at *6 (E.D. La. Mar. 24, 2021)  (quoting *In re Omega Protein, Inc.,* 548 F.3d 361, 368-69 (5th Cir. 2008)).

16.     "[T]he scope of *The Oregon* rule, which speaks explicitly only to a presumed breach on the part of the alliding vessel, . . . is not a presumption regarding either the question of causation (either cause in fact or legal cause) or the percentages of fault assigned parties adjudged negligent." *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005) (citations omitted).  Rather, it operates to shift the burden of proof—both the burden of producing evidence and the burden of persuasion—onto the moving ship.  *Am. Petrofina Pipeline Co. v. M/V SHOKO MARU*, 837 F.2d 1324, 1326 (5th Cir.1988) (citing *Delta Transload, Inc. v. M/V NAVIOS COMMANDER*, 818 F.2d 445, 449 (5th Cir.1987); *James v. River Parishes Co.,* 686 F.2d 1129, 1131–33 (5th Cir.1982). "If a defendant comes forward with evidence to rebut the presumption, a court must consider such evidence." *Vinson v. Cobb*, 501 F. Supp. 2d 1125, 1132 (E.D. Tenn. 2007).

17.     Further, "the alliding-vessel presumption of fault is not a presumption of sole fault." *Impala Terminals*, 2021 WL 1123566, at *5 (quoting *Combo Maritime,* 615 F.3d at 608).

18.     "Insofar as *The Oregon* Rule 'presumptively allocates fault when the circumstances of an allision are [relatively] unknown,' many courts decline to presume fault where there is a developed factual record concerning the circumstances of an allision." *Id.* at *7-8 (collecting cases).

19.     Unlike *The Oregon* Rule, which deals with the presumption of fault, *The Pennsylvania* Rule concerns the burden of proving causation. Under that rule, "any party to a maritime accident who violates a federal statute is presumed to be at fault, and thus, has the burden of proving that the violation could not have been a contributing cause of the allision." *Impala Terminals*, 2021 WL 1123566, at *6 (citing *The Pennsylvania*, 86 U.S. 125 (1873)).

20.     For *The Pennsylvania* Rule to apply, a party must demonstrate: "(1) proof by a preponderance of evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *In re Marquette Transportation Co.*, 292 F. Supp. 3d 719, 729 (E.D. La. 2018) (citing *United States v. Nassau Marine Corp.,* 778 F.2d 1111, 1116-17 (5th Cir. 1985)).

21.     Both Southern Oil and Alliance have presented evidence regarding fault and causation, leaving no "vacuum" to be filled by an evidentiary presumption. Therefore, application of either *The Oregon* Rule or *The Pennsylvania* Rule is unnecessary. *See Impala Terminals*, 2021 WL 1123566, at *7 (noting that the presumptions are "rendered superfluous on a fulsome record"); *St. James Stevedoring Partners, LLC v. Motion Navigation Ltd.,* No. 13-541, 2014 WL 3892178, at *6-7 (E.D. La. Aug. 6. 2014) (declining to apply either presumption because the court, as factfinder, had "heard all of the evidence upon which to make findings regarding fault and causation under the rules of admiralty negligence claims.").

**A. Sabik Oy's Fault**

22.     The Supreme Court recognized products liability, including strict liability, as part of the general maritime law in *East River S.S. Corp v. Transamerica Delaval, Inc*., 476 U.S. 858, 865 (1986).  In formulating federal maritime law, the federal courts may examine, among other sources, judicial opinions, legislation, treatises, and scholarly writings. *Air and Liquid Systems Corp. v. DeVries*, 586 U.S. 446, 452 (2019) (citations omitted).  Although the Fifth Circuit has not explicitly addressed whether the Louisiana Products Liability Act can supplement the law governing products liability under general maritime law, several judges in this court have held that state law supplements general maritime law when: (1)  there is no applicable admiralty rule; (2) local and state interests predominate; and (3) the uniformity principle is not crucial. *See Parekh v. Argonautica Shipping Investments. B.V.*, No. 16-13731, 2017 WL 3456300, at *2 (E.D. La. Aug. 11, 2017) (Morgan, J.); *Matter of American River Transp., Co., LLC*, No. 18-2186, 2019 WL 2847702, at *3 (E.D. La. July 2, 2019) (Lemmon, J.); *Island Ventures, LLC v. K-Mar Supply II, LLC*, No. 20-2263, 2020 WL 6269136, at *7 (E.D. La. Oct. 26, 2020) (Brown, C.J.); *see also Transco Syndicate No. 1, Ltd. v. Bollinger Shipyards, Inc*., 1 F. Supp. 2d 608, 614 (E.D. La. 1998) (Vance, J.) (indicating the LPLA can apply to a maritime products claim when consistent with § 402A).

23.     Since *East River*, numerous courts have embraced § 402A of the RESTATEMENT (SECOND) OF TORTS as the best expression of the law of products liability under the general maritime law.  Section 402A of the RESTATEMENT (SECOND) OF TORTS provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
>
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in  the condition on which it is sold.
>
> (2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractional relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A.

24.   Thus, to recover on a products liability claim under general maritime law, a plaintiff must establish: (1) the defendant sold or manufactured the product; (2)  the product was unreasonably dangerous for its normal use (which includes foreseeable misuse) or defective when it left the defendant's control; and (3) the defect caused plaintiff's injury.  *Vickers v. Chiles Drilling Co*., 822 F.2d 535, 538 (5th Cir. 1987); *Authement v. Ingram Barge Co.,*  977 F. Supp. 2d 606, 614–15 (E.D. La. 2013) (citations omitted).  The threshold inquiry under § 402A is whether the defendant is a seller or manufacturer of the allegedly defective product.  1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5–7 (5th ed. 2012); Daigle, 322 F. Supp.2d at 727.  Although § 402A uses the term "seller," manufacturers fall within its ambit.  *Reyes v. Wyeth Labs*., 498 F.3d 1264, 1272 n.10 (5th Cir. 1974); RESTATEMENT (SECOND) OF TORTS § 402A cmt. f.

25.   A product can be considered unreasonably dangerous for defect in design or manufacture or because of inadequate instructions or warnings.  S*ee Pavlides v. Galveston Yacht Basin, Inc.,* 727 F.2d 330, 337–39 (5th Cir. 1984); *In re M/V DANIELLE BOUCHARD,* 164 F. Supp. 2d 794, 798 (E.D. La. 2001).  Thus, a products liability claim may be premised on (1) defective design; (2) defective manufacture; and/or (3) lack of adequate warning.  *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 288 (5th Cir. 1975).

26.   For a defective manufacture claim, the plaintiff must establish that (1) the defendant sold or manufactured a product; (2) the product was unreasonably dangerous or defective when it left the defendant's control; and (3) the defect caused the plaintiff's injury.  *Penn Maritime, Inc. v. Rhodes Electronic Servs., Inc.,* 41 F. Supp. 3d 507, 524 (E.D. La. Aug. 19, 2014) (citing *Authement,*

27

977  F. Supp. 2d at 614; *see also Transco Syndicate No. 1, Ltd. v. Bollinger Shipyards, Inc.,* 1 F. Supp. 2d 608, 613–14 (E.D. La. 1998) (noting that these provisions extend to manufacturers).

27.   To decide whether a product is defectively designed and unreasonably dangerous, courts may consider how easily the manufacturer could have designed a safer alternative product. *Vickers*, 822 F.2d at 539 (citing Louisiana and Texas cases considering alternative designs).   To prove a defect in design, there must be evidence that there was a safer alternative design available at the time and that this alternative design would have prevented the risk of harm.   Further, this alternative design must be both economically and technically feasible at the time the product left the control of the manufacturer.  *Id*.

28.   Southern Oil asserts both design defect and manufacturing defect claims against Sabik Oy as to the lantern's bird deterrent feature and battery.   It contends the design of the lantern was defective because it did not include sufficient deterrents to prevent birds from landing on the light and soiling it.   Southern Oil further asserts that Sabik could have used one of several reasonable alternate designs that provided for either a more robust single bird spike or shipped the light with three wire deterrents that could be installed upon installation.  *See* ECF No. 157 ¶¶ 51-52, at 40.

29.   Southern Oil has not provided evidence that a larger bird spike or multiple spikes would have prevented the risk of harm.  To the contrary, with regard to the efficacy of bird deterrents, Southern Oil's witness Dale Carter testified that "[n]one of them work . . . They'll land right on top of them.  They don't care."  Carter Test.  When questioned about bird deterrents, Shane Schexnider likewise testified "we tried so many things . . . they [are] still going to land on it.  It don't change anything" (sic).  Schexnider Test.  Bird deterrents are deterrents, not preventers.  If the number of bird deterrents were insufficient to prevent soiling the lantern, Southern Oil should have cleaned the lanterns more frequently, including requesting additional vessel coverage if necessary to enable operators to properly clean and maintain the lights.

30.    Southern Oil has not established that the M650H lantern's bird deterrent feature was unreasonably dangerous or defective when it left Sabik's control.  Thus, it has failed to prove by a preponderance of the evidence that the bird deterrent feature of the M650H lantern was defective in either design or manufacture.

31.    Southern Oil also contends the lantern's battery was defective.  Its expert, however, does not identify any particular defect, but rather, simply concludes that there was a defect without accounting for misuse or lack of care before the incident.

32.    The Court finds that, when the lantern left the control of Sabik, it was in good working order.  *See* Ex. J-44; Mahl, 27:24-28:3; 71:14-24.

33.    Southern Oil has not provided evidence of the proper use, care, maintenance, inspection, or storage of the lantern from the time the light was taken off of the Pegasus platform until March 8, 2021, when Southern Oil placed the previously used lantern on the Well.  The record instead reflects that the lantern was left in an unsecured position behind a heater on top of a barrel on the BS 51.  Schexnider Test.  The battery began to malfunction during that time period.  Ex. J-44.

34.    Southern Oil has not proven by a preponderance of the evidence that the lantern was defective in design or manufacture rather than damaged through misuse or improper care.

35.    In Louisiana, a "seller warrants the buyer against redhibitory defects, or vices, in the thing sold." LA. CIV. CODE art. 2520. A claim in redhibition is akin to a claim for breach of implied warranty.  *Boat Service of Galveston, Inc. v. NRE Power Systems, Inc*., 429 F. Supp. 3d 261, 278 (E.D. La. 2019) (citing *Coleman v. Sears Home Improvement Products., Inc*., No. 16-2537, 2017 WL 1089580, at \*7 (E.D. La. Mar. 2017)).

36.    Considering the Court's conclusion that the M650H lantern was not defective at the time of sale, the court need not decide whether the application of general maritime law precludes

Southern Oil from asserting a claim for redhibition under Louisiana law.  *Compare* ECF No. 157 ¶

62, at 42 *with* ECF No 159 ¶ 1, at 35.  Even if Southern Oil were able to assert a redhibition claim in

this general maritime case, it has not proven the lantern had a redhibitory defect at the time of sale.

37.     The Fifth Circuit has held that a negligent misrepresentation claim is cognizable under

general maritime law, citing the RESTATEMENT (SECOND) OF TORTS § 552 as the controlling standard.

*Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp*., 346 F.3d 530, 534–35 (5th Cir. 2003).  A general

maritime claim for negligent misrepresentation requires a plaintiff to prove:

> (1) the defendant, in the course of its profession, supplied false information for its
> guidance in a business transaction;
> (2) the defendant failed to exercise reasonable care in gathering the information;
> (3) the plaintiff justifiably relied on the false information in a transaction that the
> defendant intended to influence; and
> (4) the plaintiff thereby suffered pecuniary loss.

*Cargill, Inc. v. Degesch America, Inc.,* 875 F. Supp. 2d 667, 674 (E.D. La. 2012) (citing *Otto Candies*,

346 F.3d at 535).

38.     Southern Oil alleges that Sabik misrepresented the parameters of the M650H lantern

as "more robust than the actual operational parameters," ultimately resulting in significant damages

to Southern Oil when the lanterns did not meet Sabik's designated specifications or Southern Oil's

operational requirements.  *See* ECF No. 157, ¶¶ 79-81, at 46.  The evidence reflects otherwise.

39.     Southern Oil has failed to identify a particular specification that constituted false

information.  Rather, the evidence reflects that the M650H lantern was accurately described in the

product specifications and had no defects.  Any functionality issues Southern Oil encountered were

the result of its misuse, lack of proper maintenance and/or lack of proper storage of the lantern.

40.     A breach of express warranty claim is a recognized cause of action under the Louisiana

Products Liability Act.  LA. REV. STAT. § 9:2800.58; LA. REV. STAT. § 9:2800.53(6).  Neither party

has addressed whether a general maritime products liability claim under Restatement § 402A

likewise encompasses an express warranty claim or whether same is otherwise available under

general maritime law.  The parties appear to agree, however, that Plaintiff's express warranty claim requires it to prove (1) a statement or promise about a product or its characteristics, apart from a general opinion; (2) the express warranty induced the plaintiff to use the product; and (3) plaintiff suffered damage because the express warranty was untrue.  ECF No. 108-1 at 21; No. 115 at 22-23. Even if an express warranty claim were available under general maritime law, Southern Oil has failed to prove by a preponderance of the evidence that Sabik made a false statement about the lantern that induced Southern Oil to use the product, or that Southern Oil suffered damage because the express warranty was untrue.

41.    Sabik Oy bears no fault for the allision.

## B. Captain Tyndall's Fault

42.    The Court next considers Capt. Tyndall's conduct.  After careful consideration of the testimony and evidence in the record, the Court finds that Capt. Tyndall failed to exercise reasonable care and was negligent in several distinct ways.  In reaching this conclusion, the Court carefully considered the testimony of the parties' experts, including Capt. Dave Scruton and Capt. Christopher Karentz.

43.    First, when encountering the shrimp trawler and changing his path, Capt. Tyndall failed to consult the Rose Point system to determine whether the course change resulted in any known obstructions in the new path.

44.    Rather than return to the original voyage plan immediately after passing the trawler, Capt. Tyndall stayed on a course parallel to the original voyage plan.  Ex. J-52-16B.  Then, while on the deviated path, Capt. Tyndall decided to leave the wheelhouse to get coffee before returning the vessel to its charted path, which is particularly concerning given that he was aware that the vessel was traversing a dangerous area known to have many obstructions.

45.     Capt. Tyndall then again failed to consult the Rose Point system or make note or review maps to determine where the Well or other obstructions were after changing his course back to the original voyage plan.  Karentz Depo., 47:11-49:10.

46.     Capt. Tyndall failed to keep a proper lookout when he failed to use properly all available navigational aids available to him during the course change.  Karentz Depo., 80:2-81:11; 87:3-89:14; l02:6-18.   This failure constituted a violation of Rules 5 and 7 of the Coast Guard regulations, 33 C.F.R. §§ 83.05, 83.07.

47.     Capt. Tyndall's breach of duty was a proximate cause of the allision.

48.     Alliance failed to train Capt. Tyndall properly on the usage of the radar and Rose Point systems aboard the M/V MR. CADE, including how to overlay radar over the digital chart.  Had Capt. Tyndall been trained to do so and had he done so, the charted Well would have been shown to be in his direct path.

49.     The M/V MR. CADE would not have run into the platform had the radar, Rose Point and/or other equipment been operating and used properly.  Even Alliance's expert Capt. Karentz concedes that Capt. Tyndall bore some fault for the allision.  Karentz Depo., 92:2-93:2; *see also* 59:6-14; 67:5-68:25; 75:6-76:9; 77:3-25.

**C.  Southern Oil's Fault**

50.     Southern Oil violated 33 C.F.R. § 67.05-1(b), Arrangement of Obstruction Lights,[6] by failing to have 360º lights on the Well.  This regulatory violation constitutes negligence *per se*.

---

[6] That regulation provides:

> Structures having a maximum horizontal dimension of over 30 feet, but not in excess of 50 feet, on any one side, or in diameter, shall be required to have two obstruction lights installed on diagonally opposite corners, 180º apart, or as prescribed by the District Commander, each light to have a 360º lens.

51.     Southern Oil's electrician failed to properly inspect the lantern before installation to ensure its battery health, and as a result, installed a lantern with a damaged battery that was incapable of fully charging on the Well.

52.     Southern Oil failed to use any of the available avenues to check the lantern's battery health after installation, failed to take implement measures to ensure that the light functioned throughout the entire night, and failed to take steps to determine whether the light functioned throughout the night.

53.     Accordingly, the Court finds Southern Oil shares the fault for the accident.

54.     Had Southern Oil properly lighted the Well, Capt. Tyndall would have seen the Well and avoided it on the night of the allision.

55.     The non-functioning light cannot be described as "highly extraordinary" or "extraordinarily negligent," and the Court does not find it to be so. Thus, the court applies the doctrine of comparative fault to determine the proportion of liability between Alliance and Southern Oil.

**D. Apportionment of Fault**

56.     "It is a fundamental rule in admiralty law that damages 'are to be apportioned on the basis of the comparative fault of the parties.'" *In re Marquette Transportation Co.,* 292 F. Supp. 3d at 734 (quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1469 (5th Cir. 1991)). "District courts have considerable discretion in assigning comparative fault." *Id*.

57.     Alliance Offshore, LLC, SeaTran, LLC, Mr. Cade, LLC, and the M/V MR. CADE have not differentiated amongst themselves. *See, e.g.*, Alliance Offshore, LLC, Seatran Marine, LLC, the M/V MR. CADE, and Sabik Oy's Proposed Findings of Fact and Conclusions of Law, ECF No. 159 ¶ B(2) at 2 (referring to themselves as "the Alliance Defendants"). Alliance Offshore, LLC has, however, acknowledged that, at all relevant times, it was the owner *pro hac vice*, bareboat charterer,

and/or operator of the M/V MR. CADE, which vessel was owned by Mr. Cade, LLC and chartered from its manager SeaTran Marine, LLC to Alliance.  ECF Nos. 148 at 4; 159 ¶ A(2), at 1.

58.     The Alliance Defendants offer no evidence or argument distinguishing the vessel owner's (Mr. Cade, LLC) liability from that of the bareboat charterer (Alliance) or manager (SeaTran Marine, LLC).  Instead, the defendants merely argue that, to the extent any negligence is attributable to "Alliance," it should be entitled to limit its liability.  ECF No. 159 ¶ 14, at 28.

59.     In *Reed v. S.S. Yaka,* 373 U.S. 410 (1963), the Supreme Court held that, barring explicit statutory exemption, a bareboat charterer of a vessel is personally liable for the unseaworthiness of the chartered vessel.  The Court expressly reserved decision, however, on the question of whether a bareboat charter absolves a shipowner from liability on his warranty of seaworthiness.  Courts have recognized, however, that, under general maritime law, a shipowner who has "demised" or "bareboat chartered" its vessel to a charterer no longer controls it, and thus is not liable for unseaworthiness or negligence that comes into existence while the charter is in effect.  *See In Re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico,* on April 20, 2010, 21 F. Supp. 657, 751-52 (E.D. La. 2014) (Barbier, J.) (citing *Picou v. D & L Towing, Inc.,* No. 09-2810, 2010 WL 269648, at *3 (E.D. La. July 6, 2010) (Vance, J.)).  Instead, the bareboat charterer, as  owner *pro hac vice,* "is responsible for navigation errors by its crew and seaworthiness of the vessel."  *Gabrick v. Laurin Maritime (America), Inc.,* 900 F. Supp. 669, 674 (E.D. La. 2012) (Lemelle, J.) (citing *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1372 (5th Cir. 1983); *Moore v. Phillips Petroleum, Co.,* 912 F.2d 789, 792 (5th Cir. 1990); *Mallard v. Aluminum Co., of Canada*, 634 F.2d 236, 242 n. 5 (5th Cir. 1981)).

60.     Here, Alliance Offshore, LLC has acknowledged that, at all relevant times, it was the owner *pro hac vice*, bareboat charterer, and/or operator of the M/V MR. CADE.  Although the "Alliance Defendants" do not distinguish the extent to which Alliance, Mr. Cade, LLC, or SeaTran

Marine, LLC bear responsibility for any negligence or unseaworthiness on the part of the vessel, the record does not support a finding that the M/V MR CADE was unseaworthy at the time it was chartered.  Contrary to Southern Oil's contention, the evidence did not establish that the vessel had defective and/or inadequate equipment and appurtenances, or that the radar was not working properly at the time of the allision.  The record instead reflects that the vessel was equipped with sufficient charts, radars, autopilot, navigational aids, and equipment manuals. Rather, as Capt. Karentz explained, radar sometimes experiences "ghost" effects that hide objects in the vessel's direct path as the image may reflect back twice and not show up properly when the radar received the image or electronic information, or when the radar emission bounces back off the mass and blanks out anything directly ahead of the boat.  Karentz, 40:10-41:5.  These phenomena are not the result of faulty equipment; they are known "features," not "bugs."  Captains often change the vessel's course a few degrees in each direction to allow radar to capture objects in the direct path.  *Id.*

61.     Capt. Tyndall failed to alter the course a few degrees in each direction to ensure no obstacles were directly in the vessel's path.  He also failed to overlay the Rose Point on the radar, which he admitted that he did not know how to do.  Alliance's failure to train Capt. Tyndall on the vessel's equipment's capabilities rendered the vessel unseaworthy at the time of the allision.  That fault is attributable to Alliance, not the vessel owner or manager.  Thus, considering the fault of the vessel owner and manager separately from that of the bareboat charterer, as the court must do, neither Mr. Cade, LLC, as vessel owner, nor SeaTran Marine, LLC, as manager, bear any fault for the allision.  Rather, as to the Alliance interests, fault lies with Captain Tyndall and Alliance.

62.     Neither Alliance/Captain Tyndall nor Southern Oil have established that their conduct was not a substantial contributing cause of the allision.  Had the light been working, Capt. Tyndall would not have allided with the well.  Likewise, had Capt. Tyndall been properly trained and using all available the navigational equipment aboard the vessel, he would have seen that the Well was in

his direct path even absent lighting.  Thus, the Court finds that Southern Oil and Alliance Offshore, LLC are equally at fault for the allision (i.e., Alliance is 50% liable and Southern Oil is 50% liable).  Sabik Oy, Mr. Cade, LLC, and SeaTran Marine, LLC are not at fault for the allision.

### E.  The Jones Act Claim

63.    Turner asserts claims against Alliance under the Jones Act, 46 U.S.C. § 30104, which provides a remedy to a seaman for personal injury sustained as a result of his employer's negligence.  *See REC Marine Logistics, LLC v. Richard*, 470 F. Supp. 3d 606, 612 (E.D. La. 2020) (citations omitted).

64.    The standard of care is that of ordinary prudence under the circumstances.  *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (en banc). "An employer 'has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition.'" *Omega Protein, Inc.,* 487 F. App'x at 843 (quoting THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6–22 (5th ed.)).

65.    A seaman is entitled to recovery under the Jones Act "if his employer's negligence is the cause, in whole or in part, of his injury." *Gowdy v. Marine Spill Response Corp.,* 925 F.3d 200, 205 (5th Cir. 2019) (citation omitted).   The standard of causation in Jones Act cases is "not demanding" and only requires "that employer negligence played any part, even the slightest, in producing the injury." *Id*.; *see also Grab v. Traylor Bros.*, 796 F. Supp. 2d 788, 794 (E.D. La. 2011) ("The terms 'slightest' and 'featherweight' have been used to describe the reduced standard of causation between the employer's negligence and the employee's injury.") (citation omitted), *aff'd sub nom Grab v. Boh Bros. Const. Co., L.L.C.,* 506 F. App'x 271 (5th Cir. 2013).

66.    Having determined that Alliance's negligence played a substantial part in the allision, and in light of the parties' stipulation that Turner did not cause or contribute to the allision (ECF No. 148, Stip. 26), Turner is entitled to recover under the Jones Act.

**F.  Unseaworthiness**

67.    Both Southern Oil and Turner assert an unseaworthiness claim against Alliance. "Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Gowdy,* 925 F.3d at 205 (internal quotation and citation omitted)

68.    A vessel owner's duty to furnish a seaworthy ship is "absolute and completely independent of his duty under the Jones Act to exercise reasonable care." *The Dutra Group v. Batterton*, 588 U.S. 358, 367 (2019) (internal quotation and citation omitted).

69.    In a bareboat charter, "the vessel owner transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel (thus the term 'bareboat')," and thus becomes responsible for the negligence of the crew and the unseaworthiness of the vessel. *Neptune v. Shipmanagement Services PTE, Ltd. v. Dahiya,* 15 F.4th 630, 633 n.1 (quoting *Forrester v. Ocean Marine Indemnity Co.,* 11 F.3d 1213, 1215 (5th Cir. 1993) (internal quotations omitted)).

70.    Unlike a Jones Act negligence claim, unseaworthiness does not require notice. *Luwich v. American Marine Corp.*, 956 F.3d 320, 328 & n.1 (5th Cir. 2020) (citations omitted).   Indeed, "the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).  "A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman." *Park v. Stockstill Boat Rentals, Inc.,* 492 F.3d 600, 604 (5th Cir. 2007).  The vessel may be unseaworthy "if its 'gear [is] defective,' its 'appurtenances [are] in disrepair,' or its 'crew [is] unfit.'" *Lett v. Omega Protein, Inc.,* 487 F. App'x 839, 844 (5th Cir. 2012) (quoting *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 499, (1971)).

71.    The injured seaman must prove that the owner failed to provide a vessel, including her equipment and crew, that is reasonably fit and safe for the purposes for which it is to be used. *Jackson v. OMI Corp.,* 245 F.3d 525, 527 (5th Cir. 2001) (citation omitted).  To recover damages for an

unseaworthy condition, the plaintiff is required to establish that the unseaworthy condition was a proximate cause of the injury. *Jones v. United States*, 936 F.3d 318, 324 (5th Cir. 2019). "[P]roximate cause means that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id.* (internal quotations and citation omitted).

72.     Alliance's failure to train Capt. Tyndall on proper use of the navigational equipment aboard the M/V MR CADE rendered the vessel unseaworthy at the time of the allision. *See Trico Marine Assets Inc. v. Diamond B Marine Services, Inc.,* 332 F.3d 779, 790 (5th Cir. 2003) (affirming district court's denial of limitation of liability where vessel owner sent captain out with a radar system that he had no training in how to use and record reflected that owner knew, or should have known, that the vessel was unseaworthy and that its captain was improperly trained).

## G.  Limitation of Liability

73.     The Exoneration and Limitation of Liability Act, 46 U.S.C. §§ 30501-30512, allows a vessel owner to limit its liability for maritime casualties to "the value of the vessel and pending freight." 46 U.S.C. § 30505(a); *In re Omega Protein, Inc.*, 548 F.3d 361, 371–72 (5th Cir. 2008); *In re Devall Towing & Boat Service of Hackberry LLC*, No. 18-752, 2018 WL 5316937, at *1–2 (W.D. La. Oct. 26, 2018).

74.     Given the court's finding that Mr. Cade, LLC, and SeaTran Marine, LLC bear no fault for the allision, the court need only consider whether Alliance, as owner *pro hac vice* of the M/V MR CADE by way of its bareboat charter, may limit its liability.

75.     A limitation action is a two-step proceeding. First, each claimant must prove the liability of the vessel owner, and then the vessel owner seeking limitation must establish that it lacked privity or knowledge of the unseaworthiness or negligence that caused the injury. *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003); *see also Complaint*

*of Port Arthur Towing Co*., 42 F.3d 312, 317 (5th Cir. 1995); *Cupit v. McClanahan Contractors, Inc*., 1 F.3d 346, 348 (5th Cir. 1993); *Brister v. AWI,* 946 F.2d 350, 355 (5th Cir. 1991); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).  Thus, a party is entitled to limitation only if it is without privity or knowledge of the cause of loss.  46 U.S.C. § 30505.  In other words, if a vessel's negligence or unseaworthiness is the proximate cause of a claimant's loss, the ship owner must prove it had no privity or knowledge of unseaworthy conditions or negligent acts to be entitled to limitation of liability.  *SCF Waxler Marine, L.L.C. v. Aris T M/V,* 24 F.4th 458, 472 (5th Cir. 2022) (citing *Trico Marine Assets,* 332 F.3d at 789).

76.    "[K]nowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known."  *Id*. at 789–90.  If the unseaworthy "condition could have been discovered through the exercise of reasonable diligence," a corporate owner is deemed to have knowledge of it and cannot limit its liability.  *In re Omega Protein*, *Inc.,* 548 F.3d 361, 371 (5th Cir. 2008) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 356 (5th Cir. 1991)).  Privity or knowledge thus "extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation."  *Matter of Cheramie Marine, L.L.C.*, 2023 WL 4295710, at *4 (E.D. La. 06/30/2023) (citing *Cupit,* 1 F.3d at 348).

77.    The owner must have privity or knowledge of the *actual* acts of negligence or conditions of unseaworthiness that caused the accident; "knowledge of acts of negligence or conditions of seaworthiness that did not cause the accident does not prevent the owner from limiting liability."  S*CF Waxler Marine,* 24 F. 4th at 472 (citations omitted). "Similarly, the owner's knowledge of acts that actually caused the accident, but were not acts of negligence or conditions of unseaworthiness, does not prevent the owner from limiting liability."  *Id*.

78.    The privity or knowledge standard "obliges the owner to select a competent master" and properly train the master and crew, but it does not render the owner liable for "mere mistakes of

navigation by an otherwise competent crew," because "when the owner is so far removed from the vessel that he can exert no control over the master's actions, he should not be taxed with the master's negligence." *Id*. (citing *In re Omega Protein,* 548 F.3d at 374; *Trico Marine Assets,* 332 F.3d at 790) (internal quotations and citations omitted); *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.15 (5th Cir. 1983) (en banc). Thus, mere navigational errors or other negligence by master or crew are not within the "privity or knowledge" of the vessel owner. *Omega Protein*, 548 F.3d at 372; *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982). *In re BOPCO, L.P.*, No. 11-3137, 2013 WL 4854121, at *2 (E.D. La. Sept. 10, 2013).

79.     "[W]hen the cause of the allision was the crew's errors, the owner's ability to limit its liability turns on whether the crew was incompetent, which the owner should have known, or whether the crew made mere mistakes of navigation, which the owner could not have known about. A captain's record and years of experience are relevant to this inquiry." *SCF Waxler Marine,* 24 F.4th at 473 (citing *Kristie Leigh Enters. v. Am. Com. Lines,* 72 F.3d 479, 482 (5th Cir. 1996). The court must also consider how well trained the captain is. *Id*. (citing *Trico Marine Assets,* 332 F.3d at 790).

80.     "[A]ll of these questions—the cause of the accident, the owner's privity or knowledge, and the crew's competence—are fact-specific, and therefore subject to clear-error review." *Id*. (citing *In re Omega Protein,* 548 F.3d at 361).

81.     The court has already determined that Capt. Tyndall's negligence was a proximate cause of the allision. In order to limit liability, Alliance must demonstrate that it did not have knowledge of the negligent condition.

82.      In the factually similar care of *In Re Omega Proteins*, 548 F.3d 361 (5th Cir. 2008), the Fifth Circuit addressed whether limitation is appropriate where a vessel owner fails to train a captain on the extent of a navigational tool's ability. *Omega Proteins* involved a fishing vessel's allision with an oil platform where the vessel was equipped with autopilot, radar, and a navigational

chart system.  *Id*.  The *Omega Protein* captain was accident-free for approximately twenty years, but the vessel owner failed to provide training on how to use the radar aboard its vessel, and the owner had no policy requiring the captain to use the radar's anti-collision alarm feature.  On the night of the accident, the captain had the overhead lights on in the vessel's wheelhouse, creating a "mirror effect," and was on the phone attempting to order a replacement drop when the vessel struck an oil platform. The captain and other crew members testified that they circled the platform after the allision and observed no lights and heard no sounding devices.  *Id*. at 365-66.  The district court found, among other things, that the captain had violated Rule 7 by failing to use all available means to determine if a risk of collision existed  (namely, the mirror effect prevented him from seeing the radar display). *Id*. at 367.  The court concluded that the allision was caused by the captain's "mistake of navigation" and that the vessel owner had exercised reasonable care in selecting the captain given his record and experience.  Consequently, the district court found that the owner lacked privity or knowledge of the captain's negligence, and was therefore entitled to limit its liability.

83.     On appeal, the Fifth Circuit affirmed the lower court's decision that the captain's failure to use his navigational aids caused the allision.  *Id*. at 370.  As to the district court's decision to limit liability, the Fifth Circuit determined that same was proper because the captain did not have a pattern of improper or unsafe behavior.  Thus, although the vessel owner did not do everything in its power to ensure the captain knew the full capabilities of the vessel's radar, it did select a competent master, resulting in a mere mistake of navigation that did not preclude limitation of liability.

84.     More recently, in *SCF Waxler Marine, L.L.C.  v. Aris T M/V,* 24 F.4th 458 (5th Cir 2022), the Fifth Circuit again confronted the similar situation of when it is appropriate to decline limitation in the context of a maritime allision.  The Fifth Circuit concluded that the district court erred in finding the vessel's captain incompetent based on suspensions twenty years before the incident and denying limitation on that basis.  The district court, however, declined to limit the vessel

owner's liability for two other reasons, including the owner's failure to provide the captain with training on the Rose Point navigation system and the captain's resultant failure to use all available means to maintain a proper lookout.  The Fifth Circuit thus agreed that the vessel owner had "privity or knowledge" of the conditions that contributed to the allision and denied limitation.

85.     Although Capt. Tyndall had a few years of experience and a clean record like the captain in *Omega Proteins*, Alliance hired him on the assumption that he had prior radar training, and it failed to provide him with training on its specific navigation systems, including the ability to overlay his radar over a digital chart.  Further, Capt. Tyndall admittedly was not aware that he could overlay his radar on the digital chart.  Had Capt. Tyndall done so on the night of December 2, 2021, he would have seen the Well in his direct path and avoided the allision.  Thus, in this case as in *SCF Waxler Marine,* Alliance's failure to provide the captain with training on its navigation system resulted in the captain not using all available means to maintain a proper lookout, and that failure was a proximate cause of the allision.

86.     The court concludes that Alliance is not entitled to limitation of liability because its failure to properly train Capt. Tyndall on the use the vessel's navigational equipment and his admitted lack of knowledge as to the equipment's abilities (particularly, the Rose Point system and laying same over radar) was a contributing factor to the allision and Alliance knew, or should have known, that he was not trained in the proper use of the vessel's navigational equipment.

## IV.   **CONCLUSION**

Based on the foregoing findings of fact and conclusions of law, the Court finds that finds no fault, negligence or other basis of recovery against Sabik Oy, Mr. Cade, LLC, or SeaTran Marine, LLC.  All claims against these defendants will be dismissed with prejudice.

The Court further finds that the negligence attributable to Southern Oil and negligence attributable to Alliance/Capt. Tyndall were both proximate causes of the December 2, 2021, allision.

The Court finds that this fault is shared equally, with Alliance liable for 50% of the damages and Southern Oil liable for 50% of the damages.

The Court further finds that Alliance's failure to train Capt. Tyndall on the vessel's navigational equipment renders Capt. Tyndall's negligence within its privity or knowledge. Therefore, Alliance is not entitled to limit its liability to the $1.5 million value of the vessel under the Exoneration from and/or Limitation of Liability Act, 46 U.S.C. § 30511.

The second phase (trial on damages) will commence at 9:00 a.m. on MONDAY, SEPTEMBER 23, 2024.

New Orleans, Louisiana, this ___20th___ day of August, 2024.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE